*KAOPUA (k.), KALAMA (w.), and EKEKELA (w.), *vs.* RUTH KEELIKOLANI.

APPEAL FROM DECISION OF JUDD, J.

JULY TERM, 1875.

ALLEN, C. J,; HARRIS and JUDD, JJ.

In an action for cancellation of a power of attorney, and conveyances under it, on the ground of fraud practiced by the donee of the power upon the donors:

Held, that the donors had full opportunity of ascertaining the contents of the power: they acknowledged the same before the Registrar of Conveyances: a year afterwards they drew an order on the donee for proceeds in his hands: seven years elapsed before they brought the matter into Court: and they must now abide by the contract which was made for them by their authority.

A Court cannot go on concluding that people do not understand the consequences of their own acts, and relieving them against the

*Not hitherto reported.

consequences of their own ignorance and stupidity, more especially when, as in this case, they would be obliged by doing so to inflict a wrong on third parties.

Decree set aside, and bill dismissed: JUDD, J., dissenting.

OPINION OF THE COURT, BY HARRIS, J.

By the bill it is alleged that the plaintiffs jointly with one Mahuia are heirs at law of Kaleiheana (k) who at the time of his decease was seized and posssessed of a land called Helumoa, and was tenant in common with Her late Royal Highness Victoria Kamamalu, of lands known as Kanewai, Kanewai Kahala, and Pahoa, situated at Waikiki, Oahu, near the city of Honolulu, and the defendant in this suit is the heir, by several descents, of the aforesaid Princess Kamamalu.

It appears by the testimony of Mr. Mahelona that, for some reason or other, the late Hon. John Ii and His Highness M. Kekuanaoa, guardians of the Princess Kamamalu, claimed the whole of the lands in question, and in 1859 Mr Ii drove the heirs of Kaleiheana from the land of Kanewai and kept possession of it for his ward, and shortly thereafter, in 1859, Kaleiheana's heirs commenced an action of ejectment in the Supreme Court, but were not sucessful. A reference to the record of the Court in that case shows that they were non-suited three times, and withdrew once, and being undismayed, on the arrival of William Claude Jones, Esq., in this country, they employed him, and prepared to commence anew their action in 1867, seven or eight years after the first proceedings were commenced.

They paid Mr. Jones a fee of $50, and Mr. Jones drew up a bill of complaint which he submitted to Mr. A. J. Lawrence, then recently arrived in this country, and who had been engaged by Mr. Jones to assist him in the matter. The bill goes on to allege that Lawrence, after being engaged by Mr. Jones, falsely represented to the plaintiffs that Mr. Jones was in the interest of their adversaries and desired them to employ him (Lawrence.) By the bill, however, it does not appear that they took Lawrence at his word, but went to Mr. Jones, who told them that they must give him a share of their lands, or he would no longer act for them, and thereupon they paid Lawrence a fee of $30, and employed him,

being, as they say in their bill, importuned thereto by Lawrence.

The bill goes on to allege that Lawrence caused a power of attorney to be drawn up in the English language as follows :

"Know all men by these presents, that we, Kalama, Kaopua and Nahua, of Honolulu, Oahu, Hawaiian Islands, heirs of Kaleiheana, deceased, have constituted and appointed and by these presents do constitute and appoint Andrew J. Lawrence, of Honolulu, Oahu, Hawaiian Islands, our true and lawful attorney in fact for us, and in our names to sue for, recover, take possession of, compromise, dispose of, or sell and convey all our rights, titles, and interests in the lands of Kanewai, Kanewai Kahala, Pahoa and Helumoa ; and our said attorney is authorized to sell and convey by way of compromise, or otherwise, all or any portion of our rights, titles and interests in any or all of said lands, at such prices, and on such terms as he may think best; to receive and receipt for all sums of money received for the same, and for and in our names to make such deeds of conveyance to the purchaser or purchasers thereof, as may be necessary and proper to convey our interests therein, and to do all and every act which may be necescary to carry into effect the powers and authority herein granted to him. And we hereby promise and agree to ratify all the acts of our said attorney done in the premises. And we hereby revoke all powers and authority heretofore given to any other person or persons to act for us in relation to the lands aforesaid ; and the power and authority hereby given to our said attorney is irrevocable by us until the objects for which it is given shall have been accomplished by him.

In witness whereof, we have hereunto set our hands and seals this 20th day of December, 1867.

KALAMA, [L. S.]
KAOPUA, [L. S.]
NAHUA. [L. S.]

Signed sealed and delivered in the presence of

W. P. RAGSDALE.
JAMES D. HALAI.

I certify that I have this 20th day of December, 1867, read, translated and interpreted the foregoing power of attorney to Ka-

lama, Kaopua and Nahua, the persons who executed the same.

WILLIAM P. RAGSDALE.

Interpreter and Government Translator.

REGISTER OFFICE, OAHU, SS.

On this 20th day of December, A. D. 1867, personally appeared before me Kaopua and his wife Kalama and Nahua, parties to the foregoing instrument, who severally acknowledged that they had executed the same for the uses and purposes therein set forth ; and the said Kalama, on a private examination separate and apart from her husband, declared that she had executed the same of her own free will without compulsion, fear or constraint from her said husband.

THOMAS BROWN,

Registrar of Conveyances."

Which they signed, under the impression that it was merely a power to Lawrence to recover their lands in Court. That soon after, J. D. Halai, who as clerk to Lawrence had written out the power of attorney, told them that Lawrence had sold their lands by virtue of the authority of that paper ; that they immediately complained to Governor Dominis, one of the administrators of the estate of M. Kekuanaoa, who was heir of his daughter, Princess Kamamalu, and to several others, saying that they had not intended to sell the land, and had never signed the power of attorney with knowledge of its contents ; and the bill goes on to aver that as they are informed and believe the said Lawrence was engaged by the administrators of Kekuanaoa's estate to act in the premises against the interest of these plaintiffs and was retained to act in that behalf ; and the plaintiffs aver that the conveyance made under and by authority of the said power of attorney is false, fraudulent and void, and pray that said pretended conveyance may be ordered to be delivered up to them to be cancelled.

The answer sets forth in general terms that there was no fraud on the part of the purchasers of this property ; that the plaintiffs well knew that Lawrence had authority to sell their lands; that the sum of one thousand dollars was paid for the said lands, viz : $750 for the lands held jointly with Kamamalu, and $250 for Helumoa, $200 being kept back for one of the heirs who had not signed the

power of attorney, making in all $1,200 for the interest of the heirs of Kaleiheana in the several lands, and that these plaintiffs subsequently signed an order for $650, to be taken out of the proceeds of the sale of the land in question.

The question in this case is not whether Mr. Lawrence acted with entire good faith towards his clients, but whether the purchasers acted in good faith, or in fraudulent collusion with Lawrence. Hence the allegation that plaintiffs are informed and believe that Lawrence was engaged by the administrator of the Princess Kamamalu's estate (Governor Dominis) to act in the premises against their interest and was *retained* to act in their behalf is most important, for if that averment could be proved, it would make Lawrence the defendant's agent and show that he was acting for both without the knowledge of his professed clients, which would be in fraud of them, and that fraud would necessarily be known, under the circumstances, to those acting for the persons whom this defendant now represents. But there is not only no evidence to show the truth of this allegation, but no attempt is made to show it. And surely it cannot be seriously insisted that any inference can be drawn favorable to the allegation, because Governor Dominis, who was equally available to the plaintiffs, if they had chosen to call him, did not offer himself to disprove an averment, the truth of which no one had attempted to substantiate. He, as well as the defendants' counsel, had a right to suppose that the averment was not eventually relied upon. Therefore Lawrence remains, as regards the transaction, the agent of the plaintiffs alone.

Now it might well be that Mr. Lawrence held out alluring inducements to the plaintiffs to employ him, representing to them the benefits that would result to them from his efforts ; and after he had gotten the money for the land, he may have appropriated it to his own use ; and yet the defendant would not be accountable in the slightest degree for any of his acts. He came to the defendant or to those in whose place she now stands, with a power of attorney in due form, containing a specific authority to sell these very lands. This instrument was witnessed by two Hawaiians, conversant with both languages, and duly acknowledged before the Registrar of Conveyances. Surely there was no occasion, on

the face of it, for the purchaser to go any further   We shall advert
to this again.

It is said by counsel for plaintiffs that "the evidence is conclu-
sive of fraud on the part of Lawrence." If it were so, it would not be
even indicative of any fraud or act of omission amounting to fraud
on the part of the purchasers, and it is on this ground alone that the
plaintiffs can succeed.   It is asked,  "Is it not inconceivable to one
familiar with the Hawaiian character, that these people should
authorize a newly arrived foreigner to sell out all they had for a
fourth of its market value, or still more to sell at his own discre-
tion as to price?"   Certainly it is inconceivable that they should
authorize a sale at a fourth of the market value, but it is by no
means inconceivable that they should employ confidentially a newly
arrived foreigner, and even to the extent which this instrument
indicates.   Indeed it is notorious, that whether as lawyer, phy-
sician or clergyman, or in any relation, it makes no difference that
any one has served and guarded them faithfully for years; let a
stranger put in an appearance and he stands as good and perhaps
better chance of employment and confidence.

With regard to the inadequacy of the price, it is to be taken
into consideration that they had been warring for seven years, had
been non-suited three times, and had discontinued once, had em-
ployed again counsel, (Mr. Jones himself, by the way, recently ar-
rived), given him a fee of $50, and received from him after a
time the assurance that he could go no further unless they gave
him a share of the land, and were obliged to look out for new
counsel to whom they paid $30 ; it would not appear anything very
strange that they should offer to sell out or compromise for $1,200,
nor very strange if their opponents, under all the circumstances,
should think that they were doing a reasonable if not a generous
act in acceeding to such a compromise; and it is certainly very
doubtful whether anybody could have been found in the market
to offer so large a sum for a litigated estate, nor must it be forgot-
ten that the $1,200 is not a quarter of the value of their estate,
even on the estimate, but one quarter of the value of the whole
estate, to a large portion of which the purchasers had an unqestion-
able title and the whole of which was in their possession and had
been so for a long time.

Much stress has been laid upon the fact that Halai, who was a native Hawaiian, wrote the instrument in English. But he was a mere copyer, or clerk, and copied the paper, probably, as it was given to him. There is no evidence given of the amount of education of these plaintiffs, but judging from their signatures affixed to the document, it would make but little difference to them whether it was written in English or Hawaiian, since in either case some one else must read and interpret it to them. Again, it is said that it required no power of attorney between the parties to sell when they were so near to each other; surely it needed no power of attorney to carry on the suit, and needed none to negotiate; and therefore the purchasers might reasonably suppose that it was given for something; and if for anything, for what purpose other than that for which it purported to be?

But it is said that the power of attorney contains a clause whereby the plaintiffs "promise and agree to ratify" the acts of their attorney; "but no application for such ratification appears to have been made to them by the purchaser." It would scarcely appear necessary to comment on that point. If they have "promised and agreed to ratify," it is for the Court to hold them to their promise and agreement. The words are no different in effect than if they had used the words "hereby ratifying and confirming."

But it is said the power of attorney to sell was not knowingly executed, and is void, and gave Lawrence no power to sell. And counsel in their brief go on to say "it was not a voidable contract obtained by fraud or misrepresentation, but no contract at all, and gives no basis of a title more than a forged deed." If this last position be true, then plaintiffs have no status in this Court; for it does not require a proceeding of this nature to set aside a forged deed; and the whole of this proceeding is grounded on the assumption that the power of attorney was obtained by fraud and misrepresentation. But if it be granted that plaintiffs did not know what they were signing, it would be an exceedingly strange and dangerous idea that one could sign an instrument by which another is enabled to obtain a large sum of money from a third party, and then, seven years after the act, be enabled to avoid the

effects of his act after the money has been misappropriated by their own agent and without even the pretence of an offer to restore the money and put the purchasers in the position they were in before the act. Such a holding would be to treat Lawrence as the agent of the purchasers and not as the agent for these plaintiffs.

Nor is it clear that they did not know that the instrument was an authority to sell their lands, or, in other words, to compromise their suit. Mr. Mahelona says that he heard Ragsdale say that it was an authority to Lawrence to act for them, to attend to their lands for them, to talk with the Chief about the land, and if the Chief should wish to lease or buy the lands, that he would come and consult with them: that Lawrence talked some Hawaiian himself, and said the same thing, and that he himself (the witness) told them that if Lawrence could get $6,000 or $7,000 for their land they had better sell.

Then if this be true, they were talking at the time of selling the lands, and Mr. Mahelona raised extravagant hopes in their minds about it. Surely the purchasers are not responsible if the plaintiffs' agent did not communicate to them the offer he had received or consult with them regarding the price before closing with the offer.

Again, Ragsdale swears that he did interpret the instrument to them, and read it to them so as to impart the same impression that he himself received from the paper: that money was mentioned, he thinks $1,600. The parties, (says this witness) most undoubtedly understood thoroughly that the document gave Lawrence the authority to lease, sell or compromise the land. They understood it, for that was the gist of the whole matter. I explained to them the most important parts of the document.

This is the evidence of their chosen interpreter and witness to the instrument, and if it is to be relied upon, shows not only that they understood the paper, but that the sum of money which they might hope for was being talked of; and the witness adds "the parties were apparently exhausted by long litigation and had not been treated well by the persons employed by them." It certainly can be of no consequence that when written to at a distance with no papers before him, this witness, after a lapse of seven years,

replied that the paper was a deed and the sum of money $800; for any one may have a wrong impression at that distance of time regarding a paper which is not before him, that was of no personal importance to himself, and which is only among many hundreds that passed before him in the way of business: but when the paper is put before him on the stand, and he has had the opportunity to think and refresh his memory, this is his testimony.

This paper, therefore, is produced to the purchaser, drawn up and executed in due form of law, and witnessed to have been so executed by two competent interpreters, one of whom was a professed interpreter; and acknowledged before the lawful officer to take such acknowledgments, and in addition certified by a competent interpreter to have been fully translated to the persons executing it. Surely the most cautious and prudent lawyer or counsel need go no farther.

Mr. Jones had no apprehensions excited in his mind: and if not Mr. Jones, why Mr. Stanley or Governor Dominis? Mr. Jones in the course of the hearing said that he took no care or notice of it, because he had been excluded from the case—supplanted by Mr. Lawrence. Surely Mr. Jones does himself injustice. He, as counsel in the case, would scarcely have allowed the averment to go into the bill, that he refused to go on with the case unless they gave him a share of the land—if the truth was that instead of his leaving the case, his clients withdrew the case from him. And he can, still less, mean to say that after having received $50 as a fee from these people, and left them because they would not give him an interest in the land, he saw a fraud about to be perpetrated upon them without taking sufficient interest in them to warn them. The better inference, and the one probably most consonant with the truth, is that Mr. Jones saw no wrong, suspected no wrong, and if he saw and suspected no wrong, then there was no reason why the purchasers or their attorneys should see or suspect any wrong.

Counsel urge that defendant's ancestors were not *bona fide* purchasers since they neglected to take reasonable precautions to see if the heirs of Kaleiheana had agreed to sell * * *. "The purchasers, acting under the advice of an eminent conveyancer, would not have omitted to ask for the original deeds to accompany

their purchase, if he thought it of any use to ask them. These latter deeds are now in the plaintiffs' possession."

To the first part of this it is proper to answer that the power of attorney itself sets forth a desire to sell, and one is fairly to be presumed to desire that which he deliberately sets forth in a formal document he does desire. And they, the purchasers, might have asked for the original deeds if they thought it of any use so to do, but our registry laws have taken away that importance from the fact of possessing title deeds which was necessarily attached to that fact at times when and in countries where no such laws existed. But in this particular case the only title deeds which the plaintiffs have or can have are certificates of Land Commission awards to their ancestors, taken from the public records, and any one can have a like certificate by paying a very small fee; and further, for those pieces in which the Princess Kamamalu was joint owner under the Land Commission award, her guardians and representatives undoubtedly had a like certificate, and could obtain as many as they might choose to pay for; so that truly it might be said it was of no use to ask for them, and the present possession of them by the plaintiffs can be of no inconvenience to defendant, and can afford not the smallest presumption that the power of attorney to Lawrence, by authority of which he conveyed the estates, was not signed by them for the uses and purposes in it set forth.

It further appears that the power of attorney in question was made on the 20th of December, 1867, and the purchase was not completed until fully three months afterwards, a circumstance of not much importance, but tending surely to show that there was no such haste as would tend to show an undue anxiety on the part of the purchasers; such as would accompany a consciousness of a fraudulent collusion or a collusion of any kind with the attorney in fact for the other side. Very nearly a year afterward, all the heirs of Kaleiheana, represented here, signed an order for $650 on Mr. Lawrence, to be paid out of the proceeds of sale of Helumoa and Kanewai, on which Mr. Lawrence wrote an acceptance to the effect that he had $500 belonging to them, which he would pay over on their giving him a receipt in full of all demands. From this it would appear that $500 of the money was already used up

or appropriated by Mr. Lawrence, and it is suggested that they signed this without a clear understanding of its import, and did not intend by this to ratify or acquiesce in Mr. Lawrence's sale. Mr. Widemann says that he interpreted it to them, and thinks they understood it, though he took no particular pains to make them understand it. But a Court cannot go on concluding that people do not understand the consequences of their own acts, and relieving them against the consequences of their own ignorance and stupidity, more especially when, as in this case, they would be obliged by doing so to inflict a wrong·on third parties. If Mr. Lawrence " made use of his confidential relations with them to get a power of attorney, utterly unjust and inequitable, which would enable him to sell their land for any sum however inadequate," it should be remembered that Mr. Lawrence had no confidential relations whatsoever with the party defendant or her ancestors, and the power of attorney which these plaintiffs voluntarily signed, without any solicitation on the part of the purchasers, enabled their attorney to obtain one thousand dollars for the conveyance of their interests in the lands. By their power of attorney they held Lawrence out as a person in whom they had confidence ; they had an opportunity of ascertaining most fully the contents of the paper when the interpreter, Ragsdale, was called in, and apparently, as far as one can judge by testimony, availed themselves of it. They might have availed themselves of the services of any other person to tell them what it was; and finally they acknowledged before the Registrar of Deeds that they signed it " for the uses and purposes therein set forth," which they knew or ought to have known to be a solemn and binding act required by law. They had then another opportunity to enquire into the contents of the paper, and after that there were three months during which they could have enquired, and if the instrument was not what they intended, have had the matter rectified. A year after they drew an order for some of the money. Seven years elapsed before they undertook again to question this matter in Court, and they must now abide by the contract which was made for them by their authority.

### DISSENTING OPINION OF JUDD, J.

I have not changed my opinion in regard to this case, as given in my judgment, rendered February 26, 1875, from which this appeal was taken. I therefore respectfully dissent from the above judgment.

*A. S. Hartwell* and *W. C. Jones*, for plaintiffs.

*R. H. Stanley*, for defendant.

Honolulu, August 28, 1875.

---

### DECISION OF JUDD, J., APPEALED FROM.

The bill was filed September 16th, 1874. Defendant demurred for non-joinder of parties, September 23d; demurrer was sustained and the bill amended by adding Ekekela as party plaintiff. Answer was filed November 17th, and case brought on for hearing January 21st, 1875, and proofs closed February 8th. It appears from the pleadings in this cause that Kaopua, Kalama, Ekekela and Mahuia are the heirs-at-law of Kaleiheana, deceased, who was at the time of his death seized and possessed of the land "Helumoa," and that he was a tenant in common with Her late Royal Highness Victoria Kamamalu in the lands of "Kanewai," "Kanewai Kahala," and "Pahoa," all of these lands being situate at Waikiki, Oahu, and also that the defendant is the heir-at-law of His late Highness M. Kekuanaoa, and of His late Majesty Kamehameha V., and that said M. Kekuanaoa was the heir of Her late Highness Victoria Kamamalu.

It also appears from the pleadings that a power of attorney was executed by Kaopua, Kalama and Nahua (now deceased, under whom Ekekela claims) to one A. J. Lawrence, on the 20th of December, 1867, acknowledged before Thomas Brown, Registrar of Conveyances, and by him recorded on the same day; and that under this power, the said Lawrence executed, on the 18th March, 1868, certain deeds of conveyance as follows; of the said land "Helumoa" to His Majesty Kamehameha V., for the consideration of Two Hundred and Fifty Dollars; of the lands of "Kanewai," "Kanewai Kahala" and "Pahoa," to J. O. Dominis, Administrator of the estate of Princess Victoria Kamamalu, for the consideration of Seven Hundred and Fifty Dollars, deeds

recorded respectively on the 8th and 19th of September, 1874, and that said Lawrence signed the names of Kaopua, Kalama and Nahua to these conveyances as their attorney in fact.

The bill alleges that the said power of attorney to Lawrence was written in the English language, of which the orators were ignorant, and that it was represented to them that this power gave said Lawrence, who was an attorney and counsellor at law, authority to recover said lands (which were then in the possession of His late Majesty Kamehameha V.,) by proceedings in Court, and that it was signed by them under that belief, and so far as the said power of attorney purports to authorize the said Lawrence to sell their said lands it is fraudulent and void, as they never gave or intended to give Lawrence any power to sell these lands, and the bill prays for a decree for the delivery and cancellation of said power, and also of the deeds of conveyance executed by said Lawrence. The bill, in short, alleges such misrepresentation as amounts to legal fraud.

The answer alleges that the said power of attorney was truthfully interpreted to said Kaopua, Kalama and Nahua, and that they knowingly signed, executed and acknowledged the same.

The main question at issue is whether this power of attorney was executed by the parties with a full knowledge and understanding of its contents.

The burden of proof is upon the plaintiffs to establish their case : "Fraud will never be presumed, but must be clearly established by proof ; *dolum ex indiciis perspicuis probari convenit.* It is not, however, necessary that positive and express proof thereof should be given ; for whenever it is manifestly indicated by the circumstances and condition of the parties contracting, it will be presumed to exist." Story, Contracts, §499.

As a Court of Equity, invested with more extensive and unrestricted jurisdiction than Courts of Law in cases of fraud, I now examine the whole transaction to see if fraud can be inferred from the special circumstances of this case.

The plaintiffs have shown energy, determination and persistence in pushing their claims for these lands, really worthy of admiration. The records of this Court show four actions of ejectment brought by them against the late John Ii, who was guardian

of the late Princess Victoria Kamamalu, to recover possession of these lands. But in three of these cases they were nonsuited and the last case was discontinued on their own motion.

The Princess Victoria having died in 1866, June 29th, they employ Mr. W. C. Jones, an attorney of this Court, who had lately arrived in this Kingdom, and on July 11th, 1866, he procured the allowance of their accounts as administrators of the estate of Kaleiheana, and they were decreed to be his heirs.

Mr. Jones, in 1867, drafted for them a bill for partition of these lands, in which they pray that M. Kekuanaoa, as administrator of the estate of the late Princess, may be made a party defendant. Mr. Jones says that Mr. A. J. Lawrence was associated with him in the case, and that the bill was never filed because Lawrence retained it, and had worked him (Jones) out and himself into the plaintiffs' confidence, but finally Lawrence returned it, saying it was "all right."

Lawrence prepares an exhaustive statement of the claims of these plaintiffs as the heirs of Kaleaheana, and has it presented to the King, Kamehameha V., who was then in possession of these lands; it prayed the King to allow them to take possession of Helumoa and to divide the other lands with them. Next comes the power of attorney to Lawrence, executed December 20th, 1867. On March 17th, 1868, J. O. Dominis, then sole administrator of the estate of Princess Kamamalu, applied for and received permission from the Court to expend $1200 of the funds of the estate in the purchase of the interests of the heirs of Kaleiheana in these lands.

Lawrence appeared for the heirs of Kaleiheana. The deeds by Lawrence were made the next day, March 18th, 1868.

The property in question is estimated by Dowsett and Pico as worth the sum of $4,500 to $4,900, but as the interest claimed by the plaintiffs in all the lands except Helumoa is only a half interest, it would be fair to estimate the value of the plaintiff's interest at from $2,800 to $3,000.

The plaintiffs no doubt set a higher value on the property as being the ancestral domain, and on account of the expense which they have incurred in their hitherto unsuccessful litigation for this property.

I refer to the value of the property as compared with the price which Lawrence obtained for it, being only about one-third, not that the bill alleges inadequacy of consideration, but as tending to throw light on the question whether these people could have intended to give full authority to Lawrence to sell their interest in this property without limit as to price for any sum which suited his views, and without any reservation to themselves of the right of ratifying the sale.

It is in testimony that Kaopua is quite hard of hearing; that Nahua was elderly, one of the old-fashioned retiring Hawaiians, and Kalama seems to be possessed of more zeal than intelligence.

Was it likely that they would have given this unconditional power of sale to Lawrence, a comparative stranger to them, if they had fully comprehended its import?

It is alleged in the bill that they did not understand it as meaning what it expresses on its face. The answer alleges that they did so understand it. The testimony of the subscribing witness, Ragsdale, was taken ; the other subscribing witness, J. D. Halai, having died since the bill was filed. Ragsdale swears positively, " I read the paper to them so as to impart the same impression to them that I received from the paper myself," and " that they undoubtedly understood thoroughly that the document gave Lawrence the power to lease, sell or compromise the land, because that was the gist of the whole matter."

Such testimony by a subscribing witness is very strong and requires strong proof to gainsay it. Ragsdale's memory is somewhat shaken, in my opinion, by the three letters written by him. Jan. 12th, 1874, he writes to Wm. Austin Mahuia that the paper he witnessed and translated was a *deed*, and the money mentioned was $800. Sept. 22d, he writes to Mr. Hartwell that the paper was a power of attorney, and that the parties were induced to sign the same because Lawrence said that he could make it profitable for them, and that he could get at least $1,600 or $1,800 for the lands. Oct. 1st, he writes to Mr. Stanley, that his memory had been very much assisted by Mr. Stanley's letter, etc., and that he is positive that the parties " knew they were giving Lawrence full power to sell, compromise, lease or otherwise, all their rights and titles to the

86

property mentioned in the power of attorney." He adds that something was said by Lawrence before the parties signed the document, of the petition to the King and the Court business. He says also that William Austin was one of the parties to the power of attorney, which is not the case.

In his testimony before the Master he says, that after witnessing the power of attorney "Lawrence suggested that I should add on this certificate." "When they signed the paper I put on the certificate." The witness did not have the original before him when he gave the testimony or he would have seen that the certificate referred to, of his having correctly interpreted the document, was written by Halai, and evidently contemporaneously with the entire instrument.

The loss of Halai's testimony is to be regretted. I regard Ragsdale's testimony as amounting to this : that he was called over to Lawrence's office just before Court time, and interpreted the document in the usual manner, the impression being left on his mind that the parties understood the same.

The power of attorney, though drafted by Halai, a Hawaiian, is in the English language, a circumstance of slight importance perhaps, but it is enough to rebut the presumption that they understood it and creates the necessity of showing knowledge on the part of the plaintiffs of its contents.

The impression left on the mind of a Hawaiian bystander is valuable as showing the impression likely to be left on the plaintiffs' minds.

S. W. Mahelona testifies that he stood at the door of the office and Ragsdale said "this paper is to authorize Lawrence to act for you, to attend to your lands for you, and talk with the Alii about the land ; and if the Alii should wish to lease or buy the land that he would come and consult with them. I saw them sign their names. Lawrence talked some in Hawaiian himself, and he said this paper is for me to attend to your land, for me to talk with the Chief, and if he wishes to lease or buy I will come and let you know. After the paper was signed I told them if Lawrence can get six or seven thousand dollars for your land you had better sell."

Mahelona understood that the power of attorney gave Lawrence

the power to negotiate, but that the parties reserved the right to ratify any bargain, and were to be consulted as to the price; and, if these were really the representations made, the contract does not express the true intention of the parties.

H. L. Sheldon testifies that in 1867 he occupied a desk in Lawrence's office, and frequently interpreted between him and these claimants about the lands in question, and after Lawrence had said to him that he was in treaty with the King, through Governor Dominis, for a sale, he told Kalama of this, and she replied that they wanted to get the land back, and would not sell it.

If this conversation took place after the signing of the power of Attorney, it shows what Kalama then understood Lawrence's powers to be; and it is not likely that Lawrence would have commenced negotiations to sell until after he received the power. After Sheldon learned that Lawrence had sold the lands, he told Kaopua and Kalama of it, and that the money, $1,200, was in the bank for them, and they indignantly declared they would never touch a dollar of it; and as a matter of fact, they have not received any of the money.

Mr. Jones said that when he charged Kaopua and the others with having authorized Lawrence by power of attorney to sell the land, they denied it to him.

Mr. William Austin says that when he (after having refused to sign the power of attorney on Sheldon's request) told these people what they had done, in signing this power of attorney, Kalama said, "Auwe!" (alas) and that they had not signed such a paper, but they gave Lawrence a power of attorney to act as their attorney.

I do not regard the testimony of Registrar Brown who took their acknowledgements as conclusive, for he merely asked them if they had signed the paper, and asked them no question drawing from them their understanding of the paper, nor did he tell them what its contents were.

I am forced to the conclusion that the plaintiffs believed that they were authorizing Lawrence to act for them in recovering the land, and to negotiate a sale which, if the terms were satisfactory, they would assent to.

Why should Lawrence have mentioned any sum of money to them when by the power he was unlimited as to price, unless to

induce them to sign the paper, and without which allurement they would not have signed?

I see no necessity for any power of attorney. The parties were all residents here, well known, easily accessible and not numerous. Their claims to these lands were notorious.

It is urged by the defendants' counsel that the plaintiffs must have known of Lawrence's authority to sell, because there were certain proceedings in the Probate Court, in the estate of Victoria Kamamalu, in which Lawrence appeared as attorney for the heirs of Kaleiheana. I do not regard this as of much force, for no public notice of this hearing was made by advertisement nor were the parties themselves present. Lawrence signed as attorney for the heirs including W. Austin, for whom he had no authority whatever, and though the price agreed upon for the lands was $1,200, the sum of $200 was retained on account of W. Austin's not signing the deeds.

It would seem that the notoriety of the former suits against Her Highness Victoria's guardian, and the unusual circumstances of their having constituted an attorney in fact, though residents in this Kingdom, ought to have put the Administrator, or whoever represented the Princess' estate, on their inquiry. It would have been an easy matter to have ascertained from the parties themselves if they were willing to sell at this extremely low price.

The strongest point in the defense is the order put in evidence; it is in these words :

HONOLULU, March 2d, 1869.

HON. A. J. LAWRENCE, Local Circuit Judge, Maui :

*Sir :* Please pay to Kaualua (w.), or order the sum of Six Hundred and Fifty Dollars out of the proceeds of sale of Helumoa and Kanewai.

$650.          (Signed,)          { KAOPUA, KALAMA, NAHUA.

ENDORSEMENT.

HONOLULU, April 28th, 1869.

I have Five Hundred Dollars in my hands belonging to these parties who signed the within order, which I am willing to pay

on this order when they will give me a receipt in full of all demands, and accept this order for the above amount subject to the conditions above specified.

(Signed,)      AND. J. LAWRENCE.

It is a well settled principle of law that if a person, with knowledge of the fraud, acquiesce in the contract expressly or do any act importing an intention · to stand by it, he cannot afterwards avoid it. Story, Contracts, Sec. 497.

Does this transaction make out a case of acquiescence in the fraud?

The date of the order is March 2d, 1869, more than a year after the power of attorney was given to Lawrence, and undoubtedly after the parties had knowledge of Lawrence's fraud on them, if fraud it was. Mr. Widemann testifies that he wrote this order, acting for Kaualua, the payee, and interpreted it to the parties, and thinks they understood it, but did not take any particular pains to make them understand it, nor did he tell them they would lose their rights in the lands if they signed the order.

The witness states that these parties had come to his office to pay an amount of money which they owed his principal, Mr Spencer, and he, ascertaining that they had borrowed the money for the purpose from Kaualua, got them to sign this order that she might have some security; but it appears that on February 27, 1869, a few days previous, these parties had given a note to Kaualua for this very amount of $650, and had executed a mortgage in her favor on the very lands now in question and on some other lands on Hawaii, and their acknowledgments to this mortgage were taken the very day this order was signed.

Though this would be a very strange transaction among intelligent people, yet we must remember the readiness with which old natives sign papers, not clearly understanding their import. It seems to me that they must have confused this order with some of the other transactions that were going on in Mr. Widemann's office at the time, and did not intend by this to ratify or acquiesce in Lawrence's sale, for all their other acts and words clearly show no such intention.

Lawrence's acceptance of the order, being willing to pay the sum of Five Hundred Dollars on condition of the parties giving

him a receipt in full of all demands, shows that he deemed their discharge of some value to himself; but there is no evidence that any effort was made to procure their discharge of Lawrence.

I am aware that great caution should be used by Courts of Equity in exercising the power of ordering solemn instruments affecting real estate to be delivered up for cancellation, and it is a matter of congratulation that the Courts of this Kingdom have only twice in the last ten years exercised this power.

In this case I cannot avoid the conclusion that the power of attorney was obtained by fraud. It must be remembered that Lawrence occupied towards these parties the relation of attorney or solicitor to clients; and equity would interpose to declare transactions between them void which between other persons might be held unobjectionable. 1 Story Eq. Jur. §310. He made use of his confidential relation to secure a power of attorney utterly unjust and inequitable, for it gave him the power to sell their lands for any sum however insignificant and inadequate, and was in its terms "irrevocable until the objects for which it was given shall be accomplished by him."

It would do violence to my sense of justice to allow such a transaction to stand, for if Lawrence had not been inclined to sell, he could hold the real estate tied up by this power so long as he lived and thus deprive these parties of their right of alienation.

A decree will be signed ordering the power of attorney to Lawrence, and his conveyances under it, to be delivered up for cancellation.

Honolulu, February 26, 1875.